# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT SANCHEZ, | 1:08-CV-01222 JMD HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| LARRY SCRIBNER, | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGEMENT |
| Respondents. | ORDER DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |

Albert Sanchez ("Petitioner") is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a jury verdict on October 19, 2005, finding Petitioner "guilty of the following counts as to V1: count V, commission of lewd acts; count VI, forcible rape; count VIII, forcible sexual penetration; count IX, unlawful sexual penetration; and count X, commission of lewd acts...As to V2, he was found guilty of count XIII, commission of lewd acts. As to M., he was found not guilty of count XIV, commission of lewd acts." (Lod. Doc. 5 at ). Petitioner was sentenced to two consecutive terms of fifteen years to life. (Answer at 1; Pet. at 1).

Petitioner filed a habeas corpus petition in the Fresno County Superior Court, which denied the petition on April 11, 2007. (Lod. Doc. 4).

Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District, which denied Petitioner's claims in a reasoned opinion. (Lod. Doc. 5).

Petitioner then filed a petition for review to the California Supreme Court, which the court summarily denied on July 18, 2007. (Lod. Doc. 6).

On August 19, 2008, Petitioner filed the instant federal petition for writ of habeas corpus.

On January 16, 2009, Respondent filed a response to the petition. Petitioner did not file a traverse to the answer.

Consent to Magistrate Judge Jurisdiction

On September 2, 2008, Petitioner consented, pursuant to Title 18 U.S.C. section 636(c)(1), to have a magistrate judge conduct all further proceedings, including the entry of final judgment. (Court Doc. 5). Respondent consented to the jurisdiction of a magistrate judge on November 26, 2008. (Court Doc. 11). On October 28, 2009, the case was reassigned to the undersigned for all further proceedings. (Court Doc. 23).

# **FACTUAL BACKGROUND**[1]

> Appellant was charged with multiple sexual molestation charges based upon the allegations of three girls: V1, V2, and M. The court dismissed several of the charges, he was found not guilty of one count based on V1, and not guilty of the only count based on M. He was convicted of five counts based on V1, and the single count based on V2. The jury found the multiple victim allegation true, and he was sentenced to an indeterminate one strike term.
>
> On appeal, he contends the conviction based on V2's testimony is not supported by substantial evidence because she might have dreamed certain incidents. He also contends the trial court improperly permitted a prosecution expert to testify about Child Sexual Abuse Accommodation Syndrome (CSAAS).
>
> **V1-Counts I through X**
> V1 was 15 years old when she testified at trial. When V1 was six or seven years old, she and her siblings moved in with their relatives, appellant Albert Sanchez and his wife as both their parents were not able to care for the children. V1 had an older sister, and three brothers S., A1, and A2. V1 testified appellant was very strict with the children and restricted their outside activities, and appellant and V1's older sister argued a lot. V1 sometimes got angry about appellant being strict, but V1 did not argue with appellant.
>
> V1 testified that other children sometimes stayed at appellant's house, including V2 and M. Appellant's wife knew V2's parents, and she would babysit V2 once or twice a week. M. was a relative of appellant's wife, and she sometimes spent the night. V2 and M. sometimes slept in V1's bedroom. V1 testified V2 was a few years younger and like her little sister.

---

[1] These facts are derived from the California Court of Appeal's opinion issued on May 11, 2007. (*See* Lod. Doc. 5). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *see also Sanders v. Lamarque*, 357 F.3d 943, 948 (9th Cir. 2004). Here, Petitioner has not presented evidence that would permit the Court to set aside the presumption of correctness that has attached to the State court's factual findings.

V1 testified appellant touched her on two occasions in 2004, when she was about 14 years old. The first instance occurred one day in the summer, when V1 was attending year-round school. V1 was in her bedroom when appellant walked in and talked to her. No one else was at home. Appellant suddenly began touching her vagina with his hand, over her clothes. Appellant eventually stopped, but told her not to tell anyone or he would be locked up. About one month later, V1 was watching a movie on television with her best friend; one of the characters in the movie was raped, and V1 told her friend what appellant did to her.

V1 testified the second incident occurred later in 2004, after appellant's wife died.[2]FN2 V1 thought it happened around the time of the fair, possibly in October 2004. V1 remembered that period because she repeatedly asked appellant if she could go to the fair, and appellant repeatedly said no. Appellant finally said she could go and gave her some money, and he dropped off and picked up V1 and her friend.

At some point after that time, V1 was in appellant's bedroom, making appellant's bed, and no one else was around. Appellant entered the bedroom and told her to lie down on the bed, and she complied. Appellant touched her vagina with his hands, on top of her pants. Appellant then unbuttoned and removed V1's jeans. V1 asked him to stop, but he continued and removed her underwear. Appellant took off his pants and remained in his boxer shorts. V1 testified appellant moved his hand and seemed to take his penis out of his boxer shorts, but she could not see because it was dark in the room. V1 testified appellant inserted his penis into her vagina and moved around. It hurt and she started to cry, but appellant continued and did not say anything. V1 testified that less than 10 minutes later, appellant removed his penis and told her to clean up in the bathroom. Appellant again said not to tell anyone or he would be locked up. V1 went into the bathroom and took a bath.

V1 testified appellant bought her a couple of gifts after the first and second incidents, which was unusual because it was not Christmas or her birthday. V1 testified that later in 2004, appellant and V1 argued because she did not clean the house and she had been talking with a friend. V1 testified appellant also "got tired" of her. As a result, appellant took V1 to the "Sanctuary," a shelter where children escaping hostile environments can be safe. V1 testified she was not afraid appellant was going to leave her there permanently. At the Sanctuary, a woman from Planned Parenthood asked V1 whether she was sexually active. She also asked V1 if she had ever been touched. V1 revealed that appellant touched her on two occasions. V1 testified she also told her older sister about what happened.

Appellant was charged with the following offenses as to V1: counts I and VI, forcible rape; counts II and VII, attempted forcible rape; counts III and VIII, sexual penetration by force; counts IV and IX, sexual penetration of a child under the age of 16 years; and counts V and X, commission of a lewd or lascivious act on a child.

After V1's testimony, the court granted the prosecution's motion to dismiss count I, forcible rape, and also granted appellant's motion for acquittal of count II, attempted forcible rape, count III, sexual penetration by force, and count IV, unlawful

---

[2]Appellant advised the investigating detective that his wife died on October 3, 2004.

sexual penetration.[3]

As to V1, the jury found appellant guilty of count V, commission of lewd acts; count VI, forcible rape; count VIII, forcible sexual penetration; count IX, unlawful sexual penetration; and count X, commission of lewd acts. He was found not guilty of count VII, attempted forcible rape.

**The Investigation**

Officer Stephen Coleman responded to the Sanctuary and interviewed V1 for 30 to 45 minutes. Coleman spoke to V1 in her assigned bedroom; a social worker was also present. Coleman testified V1 was "very restrained" and "basically didn't want to talk." It took "several minutes of just loosening up and general questioning to have her have a little confidence in me before I started asking any questions of her." V1 said appellant touched her on two incidents which sounded identical in nature-that appellant entered her bedroom when she was lying in bed at night, slid his hands into her sweatpants, and touched her vaginal area. Coleman asked if appellant used his finger to penetrate her vagina, and V1 said no. V1 was "[s]cared, very restrained. I basically had to ask specific questions to get responses that were very minimal in nature." V1 "looked as if she felt ashamed" and appeared ready to cry, but she did not break down. After the interview, Coleman determined that a crime had occurred and placed a protective hold on V1 pursuant to Welfare and Institutions Code section 300.

**Appellant's Pretrial Interview**

Fresno Police Detective Art Rodriguez conducted a videotaped interview with appellant. At the time of the interview, Rodriguez had not talked to V1, and he did not know that other children also stayed at appellant's house. Appellant was not aware the interview was being recorded.

Appellant was 55 years old. Rodriguez advised appellant that some allegations had been made that he had touched V1, and encouraged appellant to tell the truth. Rodriguez advised appellant of the warnings pursuant to Miranda v. Arizona (1966) 384 U.S. 436, and appellant agreed to answer questions.[4]

Rodriguez advised appellant that V1 said he touched her private parts and forced himself on her. Appellant said he would not do that, that V1 had lied about working late at school, he went to school and found her on the far side of campus with a boy, and he decided to leave her at the Sanctuary. Appellant insisted he never touched V1's body.

Rodriguez talked with appellant about DNA evidence, informed appellant that they found his DNA on V1's vagina, which meant his hand had been on her body, and asked if appellant wanted to start over.[5] Appellant said he never raped her. Rodriguez asked why his DNA was on her vagina, and whether it was there by force. Appellant said no. Rodriguez asked whether it was consensual, and appellant asked if that made

---

[3] During her testimony, V1 could not recall talking to the prosecutor's investigator about an incident when appellant had sex with her. The prosecutor decided not to impeach V1 with her prior statement to the investigator. The court subsequently dismissed charges based on that incident.

[4] Appellant moved to exclude his statements as involuntary. The court conducted a pretrial hearing on the issue, and found the statements were admissible and not involuntary.

[5] At trial, Rodriguez admitted that DNA evidence did not exist in this case, but he talked about DNA to see appellant's reaction.

a difference in court. Rodriguez asked how it would look if appellant kept denying everything but they had evidence that it happened. Appellant asked what kind of time he would be looking at, and Rodriguez said he did not know.

Appellant said he would be honest with Rodriguez, and that everything started around the time of the fair because she was really "into" boys, he took her cell phone away, and he grounded her. Afterwards, V1 sat right next to him on the couch, put her legs near him, and asked if she could have $50 and go to the fair. She was wearing small shorts. Appellant said V1 became "forward" with him, and he asked if she was going to tell on him. V1 said no. Appellant said the incident happened after his wife died, and V1 knew she could act forward and get things from him. Appellant and V1 went into another room, but he had trouble having sex because of various medications. "I went back there with her, and I couldn't do nothing because you know (inaudible) it was mostly just feeling that was it. Cause I haven't had no sex with nobody for about the last probably ... 4 1/2 years, something like that."

"Q. So what did you guys do in the room?

"A. Just mainly just feel, just like baby rub.... But I couldn't do nothing because to tell you the truth I ain't got much of anything, (inaudible) blood pressure (inaudible)."

Appellant said V1 was laying on the bed and she took off her pants. "No she always took them ... I never had to take off nothing." Appellant said he rubbed her vagina, and his finger did not go "too far" into her, maybe about an inch.

"Q. So were you on top of her, ... how did it happen. How did you try to do it?

"A. Uh at the end of the bed it was like the bed's right here. My (inaudible) would always be too big so you know what I just told her, 'well you wanna try it right here', so we just tried it like that and she put her leg on top of the dresser, I just tried like that, that was it."

Appellant said he was in bed with her for about 10 minutes.

"Q. Now when you placed your penis on her vagina it poked in a little bit, correct? At least you tried to put it in at least, correct?

"A. I tried but it wouldn't do nothing.

"Q. How deep do you think it went?

"A. It didn't go in period.

"Q. [I]t broke the skin through correct, it kinda went in a little bit?

"A. That's what I told you (inaudible) there's nothing there. [¶] ... [¶]

"Q. What was she doing this whole time when you were placing your finger or you were trying to put your penis inside, what was she saying or doing?

"A. Nothing I looked at her (inaudible) she just go with her mouth just ... that was it.

"Q. Okay.

"A. At one time I told her ... at one time I think it was the one at the fair, I told her,

'you act like you're enjoying this, I can't even (inaudible) to you'. You know but ...

"Q. Okay, she's saying that you did this against her will. That she didn't want to.

"A. No, no!"

V1 said he was hurting her and appellant stopped. Appellant asked V1 why she wanted to " 'do that if you start complaining[?]' " Appellant went to the restroom and washed his hands. Appellant said V1 never took off her blouse.

"Q. How did she look. If you were to rate her body from zero to ten, what would you give her?

"A. Well she's a young girl, she's only 14, you have to give her a 10, you know that.

"Q. There's some 14's that look good.

"A. Well [V1] isn't that good compared to her sister.

"Q. You give her a ten? Do you say a ten. Do you think she looked pretty hot?

"A. Well what I seen about her, there isn't much I seen. You know just the bottom part. I never seen the rest of her top."

Appellant said V1 was "a pretty little girl" and this type of incident happened "[j]ust a couple of times." Appellant said the first time was in September, and the second time was when the fair occurred in October. After the second time, appellant asked V1 the following:

"... Because at the fair, that was the second time. That's that's what I told her, 'you know well why do you bring up things like this and then you want $50 dollars, and then all of a sudden you tell me it, it's hurts'...."

Appellant gave her $50 at that time.

"I mean you know, as soon as I went back into the room, you know I went and sat on my couch where I was at and I don't know why, from that day on I just started feeling guilty and I just go this girl is going to get me into trouble."

Appellant admitted that at one point, he might have rubbed or placed his penis on her vagina, "but I couldn't do nothing, I told you." Appellant said that he would not have "gone through this" with V1 if he knew she was going to get him in trouble because he had lost his job.[6]

**V2-Counts XI, XII, XIII**

Detective Rodriguez testified that when he interviewed appellant, he did not know that V2 or M. also stayed at appellant's house. As the investigation continued, however, law enforcement officers interviewed these two girls, and appellant was charged with additional sexual offenses committed against these girls.

---

[6] Appellant did not testify at trial, but made a statement at the sentencing hearing in which he denied all the allegations and said that V1 made up everything because he reprimanded her for being with a boy at school, and she decided she did not want to live with him anymore. Appellant also said V2 sounded like she had been trained to say the things she did when she testified.

V2 was 12 years old and in seventh grade when she testified. She described appellant was her father's friend, and they met when appellant's dog tried to attack her dog. V2's parents were separated and she split her time between her mother and father. V2 stayed with her father every other week. Her father worked at night, and dropped her off at appellant's residence so appellant and his wife could babysit her. She stayed at appellant's house at night and sometimes in the daytime.

V2 knew some of the other children who stayed at appellant's house, including V1, V1's older sister, and M. When V2 stayed overnight, she slept on the floor or in the same bed as V1's older sister. M. stayed overnight sometimes, and she slept in either the living room or on the floor with V2. V2 slept in the bedroom across the hall from appellant's bedroom. V1 slept in another bedroom. V2 testified that adult family members of appellant and his wife occasionally stayed overnight at the house, and they usually slept in the living room.

V2 testified that when appellant got mad at the other girls, V2 would stand up for them. V2 was very protective of V1. On more than one occasion, appellant became very upset with the girls, and V2 tried to keep him out of their bedroom and away from the other girls. Appellant did not spank her but just yelled at her. V2 testified that appellant frequently stood in the bedroom doorway to make sure the children were asleep. The children, however, would still be awake and knew he was there.

V2 testified she stopped going to appellant's house about two or three years before trial, when she was in the sixth grade, because something happened and it was hard to sleep. When appellant's wife was not home, V1's older sister would sneak out of the bedroom, and V2 and V1 were left in the house by themselves.

V2 testified that appellant did something that also made it awkward and hard to sleep. There were three incidents that were kind of jumbled together, when appellant would enter the bedroom. V2 woke up on one occasion but not during the other two incidents.

V2 testified about the first incident, which occurred at night when she was nine or 10 years old. V2 was in bed, laying on her side and facing the wall. She felt a person's body laying behind her in bed.

"Q Okay. Who was that person that was in the bed with you?

"A I don't know. I did not open my eyes."

She felt that person touch her between her legs, under her sweatpants and over her underwear. The person's finger went inside her vagina. V2 testified she woke up and squeezed her legs together. The person "started to lose his grip." The person did not say anything as he touched her.

"Q Okay. Now, you say 'his', do you know it was a man?

"A It had a man's hand.

"Q What made you think it was a man's hand?

"A Because it was big."

V2 testified that on this particular night, the other males in the house were V1's brothers: A1 who was about 14 years old; S., who was nine or 10 years old, and A2, who was eight or nine years old. She was sure the person who touched her was not A1 "[b]ecause he has a smaller hand," and S. and A2 were "too small." V2 testified there were no other adult males in the house aside from appellant, "that I think of, or know of." There were no adult relatives there on that particular night.

V2 testified there were two other incidents which occurred when she was asleep in the same bed, and "I felt something touching me" in the same place between her legs. V1 was sleeping in another bed in the same room. She could not tell how big this person's hand was, but she did not think the person's finger went into her vagina. She did not react by squeezing her legs, and the touching just stopped. V2 testified the three incidents were "pretty much the same."

"Q. On the first two incidents that you have talked about, you don't know who touched you, do you, [V2]?

"A. No.

"Q. And on the third incident, you didn't open your eyes and see anybody, did you?

"A. No."

V2 told a friend about the incidents and that appellant touched her. The friend told V2 to tell her father. When V2 told her father, he became very upset and she stopped going to appellant's house. V2 also told Maria of the district attorney's office that appellant touched her on the first occasion, and she was sure about that when she spoke to Maria. V2 did not tell Maria that appellant touched her on the two other occasions because she was not sure.

As to V2, appellant was charged with counts XI, XII, and XIII, commission of a lewd or lascivious act on a child under 14 years old. After V2's testimony, the court granted appellant's motion for acquittal on counts XI and XII. Appellant was found guilty of count XIII, commission of lewd acts.

**M.-Count XIV**

M. was 10 years old when she testified. M. was related to appellant's wife. M. used to go over appellant's house and spend the night. She would sleep in the same bed as appellant and his wife, in between them. M. got along with appellant sometimes, but also had fights with him.

On one occasion when she was about six years old, she was sleeping between appellant and his wife when appellant touched her vagina with his hand. M. was facing away from appellant, and he reached over her body with his hand, and touched her vagina over her clothes. Appellant's hand did not penetrate her vagina. M. woke up when appellant touched he. Appellant's hand was still on her vagina as she tried to wake up appellant's wife. Appellant's wife woke up and told appellant to wake up. M. testified appellant was asleep, he woke up, and he stopped touching her. Appellant's wife told M. to go into the other bedroom with the boys, S. and A2. M. woke up the other children and said they should go into V1's bedroom so they could all be together if appellant became angry at them.

M. told her mother and V2 that appellant touched her. Appellant never said anything to her about the incident. M. stayed away from appellant's house for a while, then returned and stayed overnight again. She slept on the couch or with V1, and

never slept with appellant and his wife again. About a year after the incident, appellant bought her things. Appellant also told her not to tell anyone about the incident.

As to M., appellant was charged with one offense, count XIV, commission of a lewd or lascivious act on a child. He was found not guilty of this charge.

**CSAAS testimony**

Dr. Randall Robinson, a clinical psychologist, testified for the prosecution about CSAAS, "a term coined by a UCLA psychologist, Dr. Roland Summit, in 1983," which describes "the reaction of children who have been sexually abused." Dr. Robinson testified the syndrome involved a pattern of behavior explaining how someone reacts to something. As to children, the syndrome "basically says that children accommodate to the abuse, they cooperate with the abuse, they accept the abuse. There are a number of reasons for that, and that they do not report the abuse. And that if they do report the abuse, it is apprehensively, and incrementally, and inconsistently, and sometimes they retract the allegation." A child may report incrementally to test out the safety of reporting, whether the person would believe the child, or whether the child will get in trouble. A child may be apprehensive to report sexual abuse because he or she may have been threatened, afraid to disrupt the family's integrity if the family depends upon the abuser, or truly confused about what happened and whether the child is responsible for the shame and guilt.

Dr. Robinson testified it was a "myth" that a child would immediately report sexual abuse, and it was more common for a child not to make any report. It was easier for a child to report physical rather than sexual abuse. In his private practice experience, the vast number of abused children do not report until they are adults, and his adult patients have needed one or two years of therapy until they were willing to admit they were sexually abused as children. It was also not unusual for sexually abused children to remain in the house with the responsible family member, particularly if the children are dependent on the family and have nowhere to go.

Dr. Robinson had treated children who had reported sexual abuse. Such reports usually occur when a family member or school official notices the child displays behavioral symptoms like aggression, social problems, running away, and drug abuse, investigated the reason for the symptoms, and the child revealed the sexual abuse. Even if the child reports the abuse, they may give inconsistent statements to see if the other family members get upset with them. If the listener becomes agitated, the child will just avoid the entire issue. If the listener emotionally supports the child, the child will feel safer to disclose specific information. A younger child may not comprehend he or she has been sexually assaulted, whereas an older child will understand that a sexual act has occurred. Dr. Robinson further testified that a child's reaction will depend on the individual case. One child may feel guilty and humiliated, whereas another child may laugh or giggle during disclosure.

Dr. Robinson testified it was "possible" that the child would lie about sexual abuse with the goal of living somewhere else, but it was not "probable" a child would do such a thing "[b]ecause it's very embarrassing. They would, I expect a child to lie about something less embarrassing," such as whether the house rules were too strict, or they could not have friends, or "something that doesn't involve the child. Generally, when children don't want to live somewhere, they accuse somebody else of something for qualities about that person, but not involving them."

On appeal, appellant challenges the sufficiency of the evidence in support of the only conviction based on V2's testimony, count XIII, commission of a lewd act,

and argues her identification of him was based on "mere conjecture and surmise and may have been based on dreaming." Appellant contends the court improperly admitted Dr. Robinson's testimony about CSAAS and whether the children were telling the truth. Appellant concedes defense counsel did not object to Dr. Robinson's testimony but argues counsel was ineffective because Dr. Robinson offered his opinion that the complaining witnesses were truthful, and this testimony "usurped the jury's function" and constituted inadmissible opinion evidence.

Appellant contends the court imposed two consecutive indeterminate terms based on the erroneous belief that it lacked discretion to impose concurrent terms. Respondent concedes the error, but argues the matter need not be remanded because it is not reasonably probable the court would have imposed concurrent terms. Appellant contends, and respondent concedes, the abstract of judgment must be corrected as to the determinate midterms imposed for counts V and X.

(Lod. Doc. 5, Opinion of the California Court of Appeal, Fifth Appellate District, at 3-16).

## DISCUSSION

**I.    Jurisdiction**

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. Petitioner's custody arose from a conviction in the Fresno County Superior Court and Petitioner is currently incarcerated in Pleasant Valley State Prison.[7] (Pet. at 2). As Fresno County falls within this judicial district, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus. *See* 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district court where the petitioner is currently in custody or the district court in which a State court convicted and sentenced Petitioner if the State "contains two or more Federal judicial districts").

**II.   ADEPA Standard of Review**

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499

---

[7]Pleasant Valley State Prison is located in the city of Coalinga, which is also in Fresno County, California.

(9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by Lindh*, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)). The instant petition was filed in 2008 and is consequently governed by the provisions of the AEDPA, which became effective April 24, 1996. *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003). Thus, the petition "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see Lockyer*, 538 U.S. at 70-71.

As Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment, 28 U.S.C. § 2254 remains the exclusive vehicle for Petitioner's habeas petition. *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-1127 (9th Cir. 2006) (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that, "[s]ection 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction'").

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id*. (quoting *Williams*, 592 U.S. at 412). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id*. Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Lockyer*, 538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the

'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *See Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).  Furthermore, AEDPA requires that we give considerable deference to state court decisions.  The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).  We are bound by a state's interpretation of its own laws. *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

The initial step in applying AEDPA's standards requires a federal habeas court to "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more than one State court has adjudicated Petitioner's claims, the Court analyzes the last reasoned decision. *Id*. (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) for the presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision in order to determine whether that decision was contrary to or an unreasonable application of clearly established federal law. *Bailey v. Rae*, 339 F.3d 1107, 1112-1113 (9th Cir. 2003).  Here, the California Court of Appeal and the California Supreme Court were the only courts to have adjudicated Petitioner's claims.  (*See* Lod. Docs. 5, 6).  As the California Supreme Court summarily denied Petitioner's claims, the Court looks

through that decision to the last reasoned decision–namely, that of the California Court of Appeal. *See Ylst v. Nunnemaker*, 501 U.S. at 804.

### III. Review of Petitioner's Claims

Petitioner presents two grounds for habeas corpus relief in his petition, contending that his federal constitutional rights were violated by insufficient evidence to support the conviction for count 13 and trial counsel's ineffective assistance of counsel in failing to object to testimony by prosecutor's expert witness.

#### *A. Ground One: Sufficiency of the Evidence*

In his first ground for relief, Petitioner contends that the there was insufficient evidence to support his conviction on count 13, which charged Petitioner with commission of a lewd or lascivious act on a child under fourteen years old (Cal. Penal Code § 288(a)). Petitioner argues that the only evidence at the trial was the testimony of V2, who testified that she had been asleep and did not see the face of the person in bed with her. Petitioner contends V2's testimony was insufficient as she identified the perpetrator by the size of the perpetrator's hands, which Petitioner argues could have belonged to the fourteen year old male who was also staying at the residence the night of the crime. (Pet. at 6).

In reviewing sufficiency of evidence claims, California courts expressly follow the standard articulated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See People v. Smith*, 37 Cal.4th 733, 738-739 (Cal. 2005); *see also People v. Catlin*, 26 Cal.4th 81, 139 (Cal. 2001); *People v. Johnson*, 26 Cal.3d 557, 575-578 (Cal. 1980). Pursuant to the Supreme Court's holding in *Jackson*, the test to determine whether a factual finding is fairly supported by the record is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also Lewis v. Jeffers*, 497 U.S. 764, 781 (1990). Thus, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (noting under AEDPA, a petition for habeas corpus may only be granted where the state court's application of *Jackson* was objectively unreasonable).

1   Sufficiency of evidence claims are judged by "the substantive elements of the criminal
2   offense as defined by state law." *Jackson*, 443 U.S. at 324, n. 16.   Furthermore, this Court must
3   presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); *Kuhlmann v.*
4   *Wilson*, 477 U.S. 436, 459 (1986).  This presumption of correctness applies to state appellate
5   determinations of fact as well as those of the state trial courts.  *Tinsley v. Borg*, 895 F.2d 520, 525
6   (9th Cir. 1990).  Although the presumption of correctness does not apply to a state court's
7   determinations of legal questions or to mixed questions of law and fact, the state court's factual
8   findings underlying those determinations are entitled to the same presumption. *Sumner v. Mata*, 455
9   U.S. 539, 597 (1981).

10   Here, the California Court of Appeal applied the correct standard, stating that "[t]he
11   reviewing court's task is to review the entire record in the light most favorable to the judgement to
12   determine whether it discloses substantial evidence –that is, evidence that a reasonable trier of fact
13   could find the defendant guilty beyond a reasonable doubt." (Lod. Doc. 5 at 17).  The appellate court
14   correctly applied the standard finding thatV2's testimony that the perpetrator had large hands (RT at
15   1008) and that Petitioner was the only adult male in the home on that night (RT at 1009-1010) was
16   "substantial circumstantial evidence for the jury to find that appellant was the person who climbed
17   into bed next to V2." (Lod. Doc. 5 at 19).  A rational trier of fact could have inferred from V2's
18   testimony that the perpetrator was an adult and therefore that the perpetrator was Petitioner as
19   Petitioner was the only adult male at the home that night. *See Jackson*, 443 U.S. at 326 (holding that
20   the trier of fact is presumed to have resolved all conflicting inferences in favor of the prosecution).
21   Thus, in light of such evidence, the Court concludes that the California Court of Appeal's decision
22   was not an objectively unreasonable application of the *Jackson* standard and Petitioner's request for
23   relief on this ground is denied.

24     **B.**  ***Ground Two: Ineffective Assistance of Counsel***

25   Petitioner contends that his Sixth Amendment right to counsel was violated by trial counsel's
26   deficient performance, alleging that he was prejudiced by counsel's failure to object to the testimony
27   of Dr. Robinson. (Pet. at 8).  Specifically, Petitioner contends that counsel should have objected to
28   Dr. Robinson's testimony that children feel humiliation when reporting sexual abuse and that

children do not lie when making disclosures that would humiliate them. (Id).

An allegation of ineffective assistance of counsel requires that a petitioner establish two elements–(1) counsel's performance was deficient and (2) petitioner was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687(1984); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994). Under the first element, the petitioner must establish that counsel's representation fell below an objective standard of reasonableness, specifically identifying alleged acts or omissions which did not fall within reasonable professional judgment considering the circumstances. *Strickland*, 466 U.S. at 688; *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential and there exists a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687; *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

Second, the petitioner must show that counsel's errors were so egregious that the petitioner was deprived of the right to a fair trial, namely a trial whose result is reliable. *Strickland*, 466 U.S. at 687. To prevail on the second element, the petitioner bears the burden of establishing that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Quintero-Barraza*, 78 F.3d at 1348 (quoting *Strickland*, 466 U.S. at 694). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. *Strickland*, 466 U.S. at 697. Since prejudice is a prerequisite to a successful claim of ineffective assistance of counsel, any deficiency that was not sufficiently prejudicial to the petitioner's case is fatal to an ineffective assistance of counsel claim. *Id*.

Here, the Court of Appeal rejected Petitioner's claim, finding that counsel's failure to object to Dr. Robinson's testimony[8] was neither ineffective nor prejudicial. (Lod. Doc. 5 at 29-33). The

---

[8] At trial, Dr. Robinson testified about Child Sexual Abuse Accommodation Syndrome ("CSAAS"). (RT at 1215-1226). As noted by the California Court of Appeal, " CSAAS evidence has been found constitutionally admissible with the proper admonishments to the jury regarding the limits of such evidence-that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true, but admissible solely to show the victim's reactions are not inconsistent with having been molested." (Lod. Doc. 5 at 27).

appellate court first found that the failure to object was not ineffective as "[t]he entirety of the record suggests defense counsel's tactical motive was to undermine Dr. Robinson's testimony, and the children's credibility, by obtaining the concession that there was no 'real way' to apply his general statements about CSAAS to how a particular child would react in a particular circumstance." (Id. at 31). As admitted by the appellate court, such a rationalization is conjecture on the part of the appellate court as trial counsel's reasons for failing to object were not part of the appellate record. The Court finds the appellate court's post hoc rationalization of counsel's reasons for failing to object questionable. *See Moore v. Czerniak*, 574 F.3d 1092, 1108 (9th Cir. 2009) (stating, "[w]here the issue is whether counsel's performance was ineffective, we must decide that question based on what counsel's reasons for his decisions actually were, not on the basis of what reasons he could have had for those decisions"); *see also Richter v. Hickman*, 578 F.3d 944, 958 (9th Cir. 2009) (citing *Wiggins v. Smith*, 539 U.S. 510, 526-527 (2003) in stating, "[w]hen counsel offers no strategic reason for failing to perform what would otherwise constitute the duty of a reasonably competent counsel, we may not invent such a strategy by engaging in 'a post hoc rationalization of counsel's conduct' in lieu of relying on "an accurate description of [counsel's] deliberations prior to [trial]'"). However, the Court does not find the appellate court's decision to be an unreasonable application of *Strickland* as the appellate court also found that counsel's failure to object was not ineffective as Dr. Robinson's testimony was "of a general nature, and he did not offer his opinion on appellant's guilt, or the truthfulness of the allegations made by V1, V2, or M. *Indeed, Dr. Robinson conceded the application of CSAAS depended upon the particular child in each case.*" (Lod. Doc. 5 at 31) (emphasis added). As Dr. Robinson did not opine as to the credibility of the witnesses, contrary to Petitioner claims, trial counsel's failure to object is not unreasonable.

      Furthermore, the fact that Dr. Robinson did not speak directly to the credibility of the witnesses negates the prejudicial impact of counsel's failure to object to such testimony. The California Court of Appeal also noted that Petitioner had failed to establish the prejudice prong as Dr. Robinson's testimony was harmless in the face of Petitioner's admission to the police. (Lod. Doc. 5 at 32-33). Dr. Robinson's testimony was admitted for the purpose of explaining the inconsistencies of V1's testimony through CSAAS. (RT at 632). The appellate court found that

Petitioner's argument that the Dr. Robinson's testimony would permit a trier of fact to exclude any other motivation for the victim's accusation of sexual abuse was harmless in this situation as Petitioner had conceded to having a sexual relationship with V1.  The appellate court lastly concluded that prejudice could not be established as the verdict demonstrates that the jury did not believe the testimony that children never lie about sexual abuse, pointing to the jury's acquittal of Petitioner on count seven and fourteen, as evidence that the jury "separately considered each count based on the evidence, and declined to blindly accept any suggestion that the children were credible and had no reason to lie." (Lod. Doc. 5 at 33).  The Court does not find the appellate court's analysis of the prejudice prong to be an unreasonable application of *Strickland*.  As prejudice is a necessary precursor to relief under *Strickland*, Petitioner's failure to establish that he was prejudiced by the introduction of the evidence is fatal to his claim.

## IV.     Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. *Miller-El v. Cockrell*, 123 S.Ct. 1029, 1039 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides that a circuit judge or judge may issue a certificate of appealability where "the applicant has made a substantial showing of the denial of a constitutional right."  Where the court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 123 S.Ct. at 1034; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 123 S.Ct. at 1040.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a

certificate of appealability.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. The Petition for Writ of Habeas Corpus is DENIED with prejudice;

2. The Clerk of Court is DIRECTED to enter judgment; and

3. The Court DECLINES to issue a certificate of appealability.


IT IS SO ORDERED.

**Dated:   January 19, 2010**                    **/s/ John M. Dixon**
                                        UNITED STATES MAGISTRATE JUDGE